**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS LANZETTA, *Plaintiff*, | ) | No. 24 C 11404 |
| v. | ) | Chief Judge Virginia M. Kendall |
| 11902 LONGWOOD LLC, *et al*., *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Thomas Lanzetta brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 9). It is one of 15[1] related cases, all in front of this Court, that Plaintiffs' attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled in all of the related cases. Nonetheless, two separate sets of Defendants filed motions for summary judgment against Abbas: Defendant Kathleen Long (Dkt. 110) and Defendant Marcin Chojnacki along with related entities[2] (Chojnacki Defendants) (Dkt. 107). In this case, Plaintiff's Amended Complaint alleged that the Chojnacki (as well as some of the Chojnacki entities) and Long violated 18 U.S.C.§ 1962(c), (d),

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.
[2] The Chojnacki Defendants include Marcin Chojnacki, Robert Rixer, and the following entities: 11902 Longwood LLC, an Illinois Limited Liability Company; Citypoint Illinois LLC; EJ Investment Group, Inc.; Illinois Assets LLC; Mainstreet Property Management LLC; and TCF National Holdings, Inc. (Dkt. 107).

and that Rixer and some of the other Chojnacki entities violated 18 U.S.C.§ 1962(d). (Dkt. 9 ¶¶ 92–115). Plaintiff does not plead any claim against Long other than Count I.

The Chojnacki Defendants' Motion for Summary Judgment (Dkt.107) is granted in part and denied in part. The Motion is granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; it is otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. Long's Motion (Dkt. 110) is granted in full. The Court also grants summary judgment on all state-law claims other than Count III, which remains in the case and will proceed to trial unless the parties can reach a settlement.

**BACKGROUND**

Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions. the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1 statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as

inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the relevant facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations. That includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker

for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and

Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

## II. The Lanzetta Connection

With that, the Court turns to the facts that connect Lanzetta and this complicated web of actors. In late 2021, Lanzetta discovered Chase Real Estate through an Instagram advertisement that offered real estate services in Illinois and Indiana for multi-unit buildings. (Dkt. 116 ¶ 13). After seeing the Instagram ad, Lanzetta visited the Citypoint website and submitted his contact information for additional information on Citypoint's operations. (Dkt. 116 ¶ 13). Mikosz then reached out and the two had a brief introductory phone call to discuss Lanzetta's investment goals, including purchase preferences and budget for a potential real estate investment. (Dkt. 116 ¶ 14). Around the same time, Lanzetta testified that he had a conversation with Chojnacki that was "mainly about the company in general." (Dkt. 116 ¶ 15). Lanzetta testified that he understood the current owner to be an elderly man looking to offload his properties who was not increasing rents appropriately, so a lot of money could be made quickly. (Dkt. 120 ¶ 47).

In January of 2022, Lanzetta sorted through the ten or so proposals for investment opportunities that were sent to him by Mikosz and settled on a multi-unit building located at 11902 Longwood Drive in Blue Island, Illinois as a property that he was interested in purchasing. (Dkt. 116 ¶ 17). Lanzetta and Mikosz had approximately five brief phone conversations in a short period of time to discuss the Longwood Drive property. (Dkt. 116 ¶ 17).

Ultimately, Lanzetta requested that a purchase agreement be drafted for his intent to purchase the Longwood Drive property for $385,000. (Dkt. 116 ¶ 18). That agreement was signed by Lanzetta on January 13, 2022. (Dkt. 116 ¶ 18). Lanzetta testified that it was solely his decision to sign the agreement, that he didn't seek advice or guidance on the investment from anyone other than Mikosz prior to signing the agreement, and that he read the entire agreement before signing it. (Dkt. 116 ¶ 18).

The Longwood Drive purchase agreement included language that the "[b]uyer desires to purchase the Property in its current AS-IS CONDITION. (Dkt. 116 ¶ 19). Lanzetta testified that he understood that to mean that the seller wouldn't be required to make any repairs prior to the closing and the buyer understood the property was being sold in its current state and condition. (Dkt. 116 ¶ 19). Lanzetta was represented by an attorney—Blake Rosenberg—for his purchase of the Longwood Drive property. (Dkt. 116 ¶ 20). Lanzetta testified that he had no criticisms of Rosenberg's representation and it was ultimately his decision on who to hire as his legal advisor on this transaction. (Dkt. 116 ¶ 20). Lanzetta also retained a lender to finance the Longwood Drive transaction. (Dkt. 116 ¶ 21). Lanzetta testified that it was his choice who to select for financing and that he ultimately made the decision to retain the lender that financed the Longwood Drive transaction. (Dkt. 116 ¶ 21).

Lanzetta's lender ordered an appraisal of the Longwood Drive property prior to the closing that valued the Longwood Drive property at $385,000. (Dkt. 116 ¶ 22). (As in other cases, Plaintiff contends that the document should not count as an appraisal because it refers to nearby comp properties for its estimates despite the fact that the "sales comparison approach is [often seen as] the most reliable method for appraising the value." *Buchanan Energy (N), LLC v. Lake Bluff Holdings, LLC*, 2017 WL 1232973, at *6 (N.D. Ill. Apr. 4, 2017); nevertheless, the argument that the report should be set aside by a factfinder does not bear on a factual statement about the report's contents.)

Lanzetta testified that he was supplied with the current leases of all tenants of the Longwood Drive property—none of which were month to month—and had reviewed them prior to closing on the property; he maintains that when he had signed his purchase agreement, though, he was told that the leases were month-to-month and thus he could more quickly increase prices. (Dkt. 116 ¶ 23).

Lanzetta never visited the Longwood Drive property or had an independent inspection done of the property prior to closing on the sale. (Dkt. 116 ¶ 25). Lanzetta testified that the only pictures of the property that he reviewed prior to the closing was from the "Chase listings." (Dkt. 116 ¶ 25). Lanzetta closed on the Longwood Drive property on March 23, 2022 for a purchase price of $385,000 and immediately hired Mainstreet Property Management to manage the day-to-day activity of the Longwood Drive units for the next ten months. (Dkt. 116 ¶¶ 26–27). Lanzetta ultimately sold the Longwood Drive property on May 13, 2025 for $360,000. (Dkt. 116 ¶ 28).

While this was going on, Defendants were acquiring the property for themselves. On January 6, 2022, when Chojnacki was told the original owner would sell Longwood to them for

$280,000.00, Chojnacki emailed Nguyen, Irwin and Rixer "The price is $280k correct? Fuck yea this one is moving forward. What is needed from our end?" (Dkt. 120 ¶ 56).

In addition to seeking the difference in purchase price between his purchase and the $280,000 that Defendants paid, Lanzetta testified that he is entitled to approximately $20,000 in undefined damages, which he characterized as "Mainly from just condition of the property and repairs that I had to do throughout the process. And evictions and stuff like that." (Dkt. 116 ¶ 30). Defendants state that Lanzetta never served Rule 26 Initial Disclosures containing a computation of damages, to which Plaintiff highlights that on November 8, 2024, Plaintiff's counsel gave Defendants a summary of all alleged damages in the related cases that put Lanzetta's number at $30,000. (Dkt. 116 ¶ 32). Yet in Plaintiff's own statement of facts, the number is back at $20,000. (Dkt. 120 ¶ 79). Defendants maintain that the only eviction proceeding Lanzetta discusses took place after closing and is thus immaterial. (Dkt. 120 ¶ 80).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## DISCUSSION

Abbas alleges that Chojnacki himself (as well as some of the Chojnacki entities) along with Long violated 18 U.S.C.§ 1962(c), (d),[3] and that the rest of the Chojnacki Defendants (including Rixer) violated 18 U.S.C.§ 1962(d). (Dkt. 9 ¶¶ 92–115). Given the fact that the Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-

[33] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where some of the entities are only facing allegations under § 1962(d).

1182, and related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiffs paid for it. On this record, nothing indicates that Lanzetta did not get the benefit of his bargain.

It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, Lanzetta's claims about back-end damages. Defendants contend that Lanzetta's claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution. While "logically related, a property interest and a measure of damages are not the same thing." *See Ivar v. Elk River Partners, LLC*. 705 F. Supp. 2d 1220, 1234 (D. Colo. 2010). Thus, Lanzetta's claims can proceed on the alleged financial injuries descending from the representations made around the actual transaction. The Chojnacki Defendants' other general attempts to argue that any bad acts were Mikosz' alone and that there was no enterprise falls flat on the same grounds as explained in the related cases. A full review of the record, including facts contested and uncontested, could conceivably allow a reasonable jury to find that the Chojnacki Defendants participated in the operation or management of an enterprise to lure in investors through misrepresentations of building ownership, condition, and—with regard to tenants—its occupancy and rental rates. It is true that the "as-is" nature of the sale may impede the back-end damages claims, but if a jury finds that the sale itself was a product of illegal behavior, it may assess the claim differently. It is also true that a real estate broker "holds himself out to people outside of his field as a professional whose opinion as to matters within the area of his expertise—

property value in the case of a broker—can be relied upon in making such decisions as contracting to buy or sell property." *See O'Connor v. Asperger Caraher LLC*, 2006 WL 3210498, at *5 (N.D. Ill. Nov. 6, 2006).

Turning then to Long's Motion: Lanzetta's claim is different from other cases the related plaintiffs have brought against Long in that Lanzetta did not buy his property from TCF National Holdings, the entity of which Long was the sole shareholder, officer, and signatory. Further, in this case, TCF is one of the Chojnacki Defendants; Long's Motion is hers alone. Lanzetta alleged that he initially went under contract to purchase the property from TCF, but the contract was later amended to correct the seller's name to 11902 Longwood LLC. (Dkt. 115 ¶ 6; Exhibit 1). Indeed, Plaintiff does not dispute that he ultimately purchased the Longwood Drive property from 11902 Longwood LLC, which was controlled by Illinois Assets, a company owned by co-defendants Chojnacki and Rixer, not Long. (Dkt. 115 ¶ 6). Plaintiff testified that he never met, spoke, or communicated with Long, and admitted that he learned about her identity from her attorneys. (Dkt. 115 ¶ 8). Long argues that there is no evidence specific to Lanzetta that ties her to his claim.

Rather than acknowledge this complication, Lanzetta does not flesh out any argument as to Long's liability when it is undisputed that the entity that ultimately sold him the property was Chojnacki and Rixer's alone. The closest Lanzetta comes is referencing a wire transfer from TCF's bank account on March 8, 2022, with a sum of approximately $277,000 and a description that includes "11902 Longwood DR." (Dkt. 118 at 10; Dkt 117, Exhibit 49 at 6). That withdrawal alone, though, does not itself amount to the requisite showing. After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to

do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Thus, summary judgment is granted as to Long's Motion in full.

As stated above, Plaintiff cannot proceed on the "lost investment theory" and the Motions are granted with regard to the "front-end damages" undergirding that theory of injury. Drawing all inferences in favor of Lanzetta, however, the Chojnacki Defendants' Motion for Summary Judgment on Count I is otherwise denied.

## I. State-Law Claims (Counts II–V)

Next, Chojnacki moves for summary judgment on Lanzetta's state law claims for common-law fraud (Count II), violation of the ICFA (Count III); violation of the IRELA (Count IV); and negligent misrepresentation (Count V). (Dkt. 107). Plaintiffs' responses on the issues offer scant case law, instead broadly regurgitating the generalized animating grievances of the amended complaint. Accordingly, most of the state law claims cannot survive this stage in the litigation.

### a. Count II: Common Law Fraud and Count V: Negligent Misrepresentation

"In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (citing *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 619 (Ill. 1995)).

Negligent misrepresentation has essentially the same elements, except "the defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action." *Doe v. Dilling*, 228 Ill. 2d 324, 360 (Illinois 2008). "For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the

plaintiff to communicate accurate information." *Id.* (citing *Board of Education of City of Chicago v. A, C & S, Inc.,* 546 N.E.2d 580 (Illinois 1989)).

Starting with Count II: the Chojnacki Defendants highlight Lanzetta's sole pre-purchase conversation with Chojnacki did not involve the property that Lanzetta selected but rather a general overview of Citypoint as a whole. (Dkt. 108 at 9). Plaintiff makes no attempt to dispute this picture, instead generally asserting that Mikosz and Chojnacki were jointly giving him the impression of things. He then cites to four statements of additional fact, but none of the cited statements contain any false statement of material fact attributed to any Chojnacki Defendant. (Dkt.118 at 20). That is insufficient. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case," *see, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). It is neither required nor appropriate for the Court to "sift through the record and make [the] case for him." *See 5443 Suffield Terrace*, 607 F.3d at 510. Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count II.

Returning briefly to the negligent misrepresentation claim:[4] Plaintiff did not specifically allege a duty in the Amended Complaint. (Dkt. 9 at 25). Nor does Plaintiff meaningfully address the Defendants' arguments as to negligent misrepresentation in the Response. (Dkt. 118 at 22). Ultimately, though, what dooms Plaintiff's claim here is the same lack of prosecution that impedes the common law fraud claim. Plaintiffs do not make the requisite arguments here, and the court

---

[4] While Illinois law generally bars plaintiffs from asserting tort claims such as negligent misrepresentation where they seek to recover only economic losses, it is subject to certain exceptions where "one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations," an exception that has been applied to real estate brokers. *See Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, 2016 WL 3940092, at *8 (N.D. Ill. July 21, 2016) (collecting cases).

will not do it for them. *See Little v. Cox's Supermkts.*, 71 F.3d 637, 641 (7th Cir. 1995) (holding that the court "is not required to scour the party's various submissions to piece together appropriate arguments" as it "need not make the lawyer's case").

**b. Count III: ICFA**

In Count III, Plaintiff alleged that Chojnacki violated Illinois's consumer protection statute, the ICFA. *See* 815 ILCS 505/1–505/12. "To prevail on a claim under the ICFA, a plaintiff must plead . . . that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quotation marks omitted). "The Illinois Consumer Fraud Act affords broader protection to consumers than the cause of action available under common-law fraud." *Letoski v. Coca-Cola Co.*, 753 F. Supp. 3d 650, 664 (N.D. Ill. 2024)*; Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 751 (Illinois 1994) ("[T]he intent of the Consumer Fraud Act was to lessen the burden of proof in a claim for certain misrepresentations."). "Therefore, to state a cause of action for statutory fraud, a party need not prove all the elements of common law fraud." *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 898 N.E.2d 194, 203 (Ill. App. 2008) (citation omitted).

" 'Intent' under the Act means 'that the defendant intends for the plaintiff to rely on the deception' rather than 'the defendant's intent to deceive' under common-law fraud." *Letoski*, 753 F. Supp. 3d at 664. Conduct is deceptive "if it creates a likelihood of deception or has the capacity to deceive" a "reasonable consumer." *Benson*, 944 F.3d at 646. It is unfair if it offends public policy; is "immoral, unethical, oppressive, or unscrupulous"; and causes substantial injury to consumers. *Id.* at 647.

A buyer must prove either 1) "the buyer would have acted differently knowing the information" or the act "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203 (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 584 (Illinois 1996)). "Furthermore, a plaintiff's actual reliance is not required, but a plaintiff must show that defendant's consumer fraud proximately caused their injury." *Id.*

While Lanzetta's common-law fraud claim cannot proceed to trial, under the ICFA's lesser standard, Lanzetta's purchase being appraised for his exact purchase price might not deter a jury from finding that Chojnacki's behavior was designed to induce Lanzetta's reliance on the inefficient and old-school seller narrative to make the investment look more guaranteed to in turn secure a future profit on properties that Defendants had not yet purchased themselves. In Response, Plaintiff points to some behavior that is perfectly legal, such as identifying longtime owners and offering them opportunities to sell. (Dkt. 118 at 22). But Plaintiff also has presented evidence of a potential scheme to convince sellers of a bargain real estate deal that simultaneously provided Defendants with a near-guaranteed investment opportunity. (*Id.*) A jury could find that the scheme alleviated some of the traditional risks of real estate investments for Defendants—namely, the ability to flip the property for a profit—by ensuring a buyer was ready to go on the flip before Defendants even finalized their initial purchase. On this record, it remains disputed whether Chojnacki's representations and conduct "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203.

Defendants also contend that Lanzetta has presented no evidence of damages because he has not sufficiently tied damages to this part of his claim. (Dkt. 108 at 13). Yet Lanzetta has offered

some evidence on the alleged six-figure damages, and it is up to the jury to assess the validity, if any, of that sum. In analyzing a claim under the Illinois statute, courts consider "the totality of the information made available to the plaintiff." *Benson*, 944 F.3d at 646 (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005)). That inquiry, by its definition, will peer beyond the singular "seller's identity" quotation to assess the full picture available to Lanzetta in his dealings with Defendants.

**c. Count IV: Illinois Real Estate License Act**

Under the Illinois Real Estate License Act, licensees "shall treat all customers honestly and shall not negligently or knowingly give them false information." 225 Ill. Comp. Stat. Ann. 454/15-25. "A licensee engaged by a seller client shall timely disclose to customers who are prospective buyers all latent material adverse facts pertaining to the physical condition of the property that are actually known by the licensee and that could not be discovered by a reasonably diligent inspection of the property by the customer." *Id.* The Act "protects real estate licensees when they make false statements if the false information was provided by the property owner and the broker had no reason to believe the information was incorrect." *See Aharon v. Babu*, 2023 WL 2214429, at *6 (N.D. Ill. Feb. 24, 2023). In other words, it requires a plaintiff to prove "that the false information (i) did not come from the seller, (ii) was material to the buyer, and (iii) caused damages." *Edson v. Fogarty*, 138 N.E.3d 238, 246 (Ill. App. 2019).

Under the Illinois Real Estate License Act, licensees "shall treat all customers honestly and shall not negligently or knowingly give them false information." 225 Ill. Comp. Stat. Ann. 454/15-25. "A licensee engaged by a seller client shall timely disclose to customers who are prospective buyers all latent material adverse facts pertaining to the physical condition of the property that are actually known by the licensee and that could not be discovered by a reasonably diligent inspection

of the property by the customer." *Id.* The Act "protects real estate licensees when they make false statements if the false information was provided by the property owner and the broker had no reason to believe the information was incorrect." *See Aharon v. Babu*, 2023 WL 2214429, at *6 (N.D. Ill. Feb. 24, 2023). In other words, it requires a plaintiff to prove "that the false information (i) did not come from the seller, (ii) was material to the buyer, and (iii) caused damages." *Edson v. Fogarty*, 138 N.E.3d 238, 246 (Ill. App. 2019).

Defendants acknowledge that Lanzetta was arguably a customer, and thus, under the Act, Chojnacki had a duty to refrain from supplying him false information. (Dkt.108 at 14). Instead, they argue that Lanzetta has only recounted one interaction with Chojnacki and has testified that the substance of that conversation was the general overview of the Citypoint business plan. (*Id.* at 14). Thus, the duty was never breached.

Rather than engage with this contention on the substance, Plaintiff recites the general theory of the case with conclusory assessments, declaring the arguments "without merit" and following that with an excerpt from an expert report and general references to dozens of exhibits without citation, the majority of the 56.1 statement, and zero references to case law. Plaintiff does not identify a specific misrepresenting statement from Chojnacki, instead offering general testimony that he was involved in representing Lanzetta as his broker. Mere conclusory assertions, whether made in pleadings or in affidavits, are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985).

"Judges are not like pigs, hunting for truffles buried in" the record. *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 436 (7th Cir. 2002). Thus, the Court will not "address those arguments which it finds incomprehensible." *Pope v. United States*, 2012 WL 5389807, at *2 (N.D. Ill. Nov.

1, 2012) (citing *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1470-71 (7th Cir. 1990)); *United States v. Anzaldi*, 2013 WL 393326, at *5 (N.D. Ill. Jan. 31, 2013) ("the Court refuses to address nonsensical arguments") (citing *Morton v. Greer,* 61 F.3d 906, 906 (7th Cir. 1995) (stating that briefs which contain no identifiable argument will be dismissed)); *Schramm L. Grp., LLC, v. Pitney Bowes Inc.*, 2026 WL 636820, at *2 (N.D. Ill. Mar. 6, 2026) ("The Court needn't consider . . . 'underdeveloped, conclusory, and undeveloped' argument[s].") (cleaned up) (quoting *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)); *United States v. Vance*, 2022 WL 1831138, at *1 (7th Cir. June 3, 2022) ("courts need not address arguments . . . that are 'too weak to require discussion' ") (quoting *United States v. Joiner*, 988 F.3d 993, 995 (7th Cir. 2021)); *Smith,* 910 F.2d at 1470–71 (the Court "cannot be called upon to supply legal research and organization to flesh out a party's arguments"). Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count IV.

**<u>CONCLUSION</u>**

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment [107] is granted in part and denied in part. The Motion is granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; it is otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants summary judgment on all state-law claims other than Count III. Long's Motion [110] is granted in full.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026